IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE ASS'N OF INT'L AUTOMOBILE MANUFACTURERS, Plaintiff, | : | |
| v. | : | C.A. No. 06-69T |
| W. MICHAEL SULLIVAN, in his official capacity only as Director of the Rhode Island Department of Environmental Management, Defendant. | : | |

**PLAINTIFF'S OBJECTION TO DEFENDANT'S RULE 12(b)(1) MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURSIDICTION**

Plaintiff, The Association of International Automobile Manufacturers, hereby objects to Defendant's Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction. In further support hereof, Plaintiff relies on the accompanying memorandum with attached Affidavit of John M. Cabaniss, Jr. filed herewith.

Plaintiff respectfully requests oral argument hereon, and estimates fifteen (15) minutes to argue in opposition to Defendant's Motion to Dismiss. Plaintiff further requests a conditional evidentiary hearing if the Court deems such hearing necessary.

Dated: April 25, 2006

Respectfully Submitted,

Plaintiff Association of International Automobile Manufacturers,

By its Attorneys,

Joseph V. Cavanagh, Jr. (#1139)
Kristin E. Rodgers (#4842)
Mary C. Dunn (#6712)
BLISH & CAVANAGH, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903
Tel: (401) 831-8900
Fax: (401) 751-7542
Emails: jvc@blishcavlaw.com
ker@blishcavlaw.com
mcd@blishcavlaw.com

Raymond B. Ludwiszewski
Charles H. Haake
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
Emails: rludwiszewski@gibsondunn.com
chaake@gibsondunn.com

Of Counsel

**CERTIFICATION**

I hereby certify that on the 25th day of April, 2006, a copy of the within Motion was hand delivered to the following counsel of record:

Michael Rubin, Esq.
Trish K. Jedele, Esq.
Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE ASS'N OF INT'L AUTOMOBILE MANUFACTURERS, Plaintiff, | : | |
| v. | : | C.A. No. 06-69T |
| W. MICHAEL SULLIVAN, in his official capacity only as Director of the Rhode Island Department of Environmental Management, Defendant. | : | |

**MEMORANDUM IN SUPPORT OF OBJECTION OF PLAINTIFF ASSOCIATION OF INTERNATIONAL AUTOMOBILE MANUFACTURERS TO DEFENDANT'S MOTION TO DISMISS**

Raymond B. Ludwiszewski
Charles H. Haake
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave. NW
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Of Counsel

Joseph V. Cavanagh, Jr. (#1139)
Kristin E. Rodgers (#4842)
Mary C. Dunn (#6712)
BLISH & CAVANAGH, LLP
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903-1765
Telephone: (401) 831-8900
Facsimile: (401) 751-7542

Attorneys for Association of International Automobile Manufacturers

TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. FACTUAL BACKGROUND ........ 3

III. ARGUMENT ........ 8

A. Both of AIAM's Claims For Relief Alleging Preemption Under Federal Law Are Ripe For Review Because The DEM Regulations Are Final And Impose An Immediate Hardship On Automobile Manufacturers. ........ 8

1. AIAM's Claims Are Fit For Review Despite The Pendency of California's Waiver Application. ........ 10

2. AIAM Has Alleged Sufficient Facts To Satisfy The Hardship Prong ........ 12

B. AIAM'S First Claim For Relief Alleging Preemption Under EPCA Is Ripe For Review Irrespective Of The Pending Clean Air Act Waiver Request. ........ 15

IV. CONCLUSION ........ 18

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab. v. Gardner,* 387 U.S. 136, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967). .................... 8, 14

*Ciba-Geigy Corp. v. United States EPA*, 801 F.2d 430 (D.C. Cir. 1986) .................................... 10

*Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 86 L. Ed. 1563, 62 S. Ct. 1194 (1942)............................................................................................................. 12

*Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530 (1st Cir. 1995) .. 10, 12, 13

*Hotel Employees. & Restaurant Employees. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507 (9th Cir. 1992) ........................................................................................... 11

*International Truck and Engine Corp. v. Lloyd*, CIV S-01-1245 (E.D. Cal. Oct. 24, 2001)............................................................................................................................ 14

*Lincoln Dodge v. Sullivan, civil Action No. 06-70T* ................................................................ 1

*Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)............................................................................................................................ 12

*Motor and Equipment Manufacturers Ass'n v. EPA*, 627 F.2d 1095 (D.C.Cir. 1979)............. 3, 15

*Motor Vehicle Mfrs. Ass'n of the United States v. New York State Dept. of Envtl. Conservation,* 17 F.3d 521 (2d. Cir. 1994) .......................................................................... 14

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983)........................................... 11, 12, 14

*Pustell v. Lynn Public Schools*, 18 F.3d 50 (1st Cir. 1994)........................................................ 11

*Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 125 L. Ed. 2d 38, 113 S. Ct. 2485 (1993)......................................................................................................................... 2, 14

*Rhode Island Ass'n of Realtors v. Whitehouse*, 199 F.3d 26 (1st Cir. 1999) ................................. 9

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26 (1st Cir. 1996) ....................... 11

*Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir. 1994) ................................ 9, 11

*Riva v. Com. of Mass.*, 61 F.3d 1003 (1st Cir. 1995) .................................................................. 11

**Statutes**

42 U.S.C. § 7507 ....................................................................................................................... 14

42 U.S.C. § 7543(a) .......... 2, 14

42 U.S.C. 7543(b) .......... 3

49 U.S.C. § 32919 .......... 1, 18

**Other Authorities**

41 Fed. Reg. 25015 (1976). .......... 17

68 Fed. Reg. 52,922 (Sept. 8, 2003) .......... 17

71 Fed. Reg. 17,566 (April 6, 2006) .......... 17, 21

70 Fed. Reg. 51,414 (Aug. 30, 2005) .......... 2

**MEMORANDUM IN SUPPORT OF OBJECTION OF PLAINTIFF ASSOCIATION OF INTERNATIONAL AUTOMOBILE MANUFACTURERS TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff, the Association of International Automobile Manufacturers ("AIAM"), hereby respectfully submits this Memorandum in support of its Objection to the Defendant's Motion to Dismiss.[1]

## I. INTRODUCTION

This action seeks judicial review of recent amendments to Regulation 37 adopted by the Rhode Island Department of Environmental Management ("DEM"). These amendments adopt regulations recently enacted by the California Air Resources Board ("CARB") limiting the amount of greenhouse gases emitted from motor vehicles. The primary greenhouse gas impacted by the regulations is carbon dioxide ("$CO_2$") which accounts for approximately 95% of all greenhouse gas emissions from motor vehicles. *See Complaint* ¶ 34. Carbon dioxide emissions are inextricably linked to the amount of fuel consumed by an automobile, and the only way to reduce $CO_2$ emissions from a gasoline-powered motor vehicle is to improve the fuel economy of the vehicle.

Regulation of motor vehicle fuel economy, however, is the exclusive province of the federal government pursuant to the Energy Policy and Conservation Act of 1975 ("EPCA"), and federal law preempts any State law or regulation "related to fuel economy standards or average fuel economy standards." 49 U.S.C. § 32919. Accordingly, the National Highway Traffic Safety Administration ("NHTSA"), the agency charged with administering the federal Corporate

---

[1] A similar motion was filed in a companion case, *Lincoln Dodge, et al. v. Sullivan*, Civil Action No. 06-70T.

Average Fuel Economy ("CAFE") program, has concluded that a "state law that seeks to reduce motor vehicle carbon dioxide emissions is both expressly and impliedly preempted" by EPCA. *Average Fuel Economy Standards for Light Trucks*, 70 Fed. Reg. 51414-01, at 51457 (Aug. 30, 2005). AIAM filed this action alleging that the DEM Regulations are preempted under both EPCA and the Clean Air Act, which prohibits states from adopting regulations "relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a).

The Defendant argues that this case is not justiciable because California has requested a waiver of Clean Air Act preemption, and EPA's consideration of that waiver application constitutes a contingent event that renders this action not ripe for review. AIAM generally concurs with the legal arguments set forth in the Plaintiffs' Memorandum in Support of Objections to Defendant's Motion to Dismiss in the *Lincoln Dodge* matter demonstrating why the Defendant's position has no merit.[2] AIAM files this separate brief to highlight a few, vital points.

First, the Defendant's ripeness argument ignores the finality of the DEM regulations and the immediate harm the enactment of those regulations causes AIAM members. The law is well settled that pre-enforcement review of a state regulation is available where the action presents a predominantly legal question, and the plaintiff is faced with "the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57, 125 L. Ed. 2d 38, 113 S. Ct. 2485 (1993). Here CARB's analysis of the California regulations, on which the DEM

---

[2] As a trade association, AIAM does not take any position concerning the competitive impacts of the DEM Regulations alleged in the *Lincoln Dodge* Complaint, and thus does not adopt the arguments in the *Lincoln Dodge* parties' opposition brief concerning whether the DEM Regulations will cause product restrictions and resultant harm to the dealer plaintiffs.

Regulations are based, demonstrates that compliance will require manufacturers to redesign fundamentally their motor vehicle fleets to incorporate new, advanced technologies that improve fuel economy, and that the minimum lead time required to reach compliance is four years. The first model year subject to the new regulations is 2009, and the standards become progressively more stringent in subsequent years. Manufacturers must therefore either act now to ensure compliance in the future or risk sanctions. This is precisely the type of dispute the Supreme Court has held on multiple occasions is ripe for judicial review, and the fact that California's Clean Air Act waiver request is pending at EPA does not alter this conclusion.

Second, the Defendant's argument concerning AIAM's claim for preemption under EPCA is based entirely on the legally false premise that the decision by EPA on California's waiver of preemption under the Clean Air Act will be dispositive of the question of EPCA preemption. This is not true. Nothing in Section 209 of the Clean Air Act mandates that EPA must consider and resolve preemption under EPCA in deciding whether to grant California a waiver. 42 U.S.C. § 7543(b); *Motor and Equipment Manufacturers Ass'n v. EPA*, 627 F.2d 1095 (D.C. Cir. 1979). Thus, even if EPA were to grant the waiver, the matter of EPCA preemption could remain open, and this court would still need to decide that issue. In light of the need for the automobile industry for a swift and definitive answer concerning the legality of the DEM Regulations, there is no reason in law or prudence for this court to delay reaching the merits.

## II. FACTUAL BACKGROUND

Reducing $CO_2$ emissions from motor vehicles presents a unique challenge for automobile manufacturers. Because the amount of $CO_2$ depends only on the quantity and type of fuel burned, and because there is no exhaust aftertreatment device that can capture or reduce $CO_2$ emissions from motor vehicles, the only way to reduce $CO_2$ emissions from gasoline-powered

motor vehicles is to improve fuel economy. *Affidavit of John M. Cabaniss* ("Cabaniss Aff.") ¶¶ 7-8 (attached as Exhibit "A").

In adopting the California standards on which the DEM Regulations are based, CARB determined that in order to meet these new standards, automobile manufacturers will be forced to redesign the cars and trucks they sell to incorporate new technology that currently do not appear on many of their product lines. For example, by 2011 the regulations set a fleet-wide average limit for passenger cars and small light-duty trucks of 267 grams of $CO_2$–equivalent per mile driven, which translates to a fleet-wide fuel economy average of approximately 33.2 miles per gallon. *Cabaniss Aff.*, ¶ 12. In order to meet this standard, CARB has determined in its Staff Report and Initial Statement of Reasons (the "ISOR")[3] for the California regulations that automobile manufacturers will need to incorporate a "near-term technology package" into their cars and trucks. The "near-term technology package" includes a number of automotive technologies, which when used in various combinations lead to increased fuel economy and reductions in CO2 emissions. *Id.*, ¶ 15; *ISOR* at 59, 63-67.

The extent to which a particular manufacturer will be compelled to include a "near-term technology package" on its cars and trucks depends on the baseline fuel economy of that manufacturer's fleet. *Cabaniss Aff.*, ¶ 16, *ISOR* at 116-117. Thus, for example, CARB has determined that Honda will have to incorporate a "near-term technology package" on 24% of its passenger cars and small light duty trucks in order to meet the 2011 model year standard. *Cabaniss Aff.*, ¶ 16; *CARB: Addendum Presenting and Describing Revisions to the Initial*

---

[3] Relevant portions are discussed in the Affidavit of John M. Cabaniss, Jr.; the entire documents can be found at http://www.arb.ca.gov/regact/grnhsgas/isor.pdf.

*Statement of Reasons on September 10, 2004* (the "Revisions to ISOR")[4] at 12, Revised Table 6.2-3. Nissan, in contrast, will need to incorporate a "near-term technology package" on 49% of its entire passenger cars and small light duty trucks in order to meet the 2011 model year standard, according to CARB estimates. *Id.*[5]

The "near-term technology package" described by CARB includes a number of automotive technologies which are new to the industry and are currently available on only a very few production models of cars and trucks. The package includes, for example, stoichiometric gasoline direct injection ("DI"). *Cabaniss Aff.*, ¶ 18. DI engines inject fuel directly into the combustion chamber. This approach is far more difficult and requires much higher injection pressures than the current method of injecting fuel into the intake before the engine. It requires a complete redesign of the fuel system, addition of expensive, high-pressure injectors, and a complete recalibration of the computer controls. *Id.* Integrating such a technology would take a considerable amount of time and engineering effort. *Id.* The 2011 model year begins in early 2010.[6] Thus, to the extent that new cars and trucks would need to include such a new technology and be ready for delivery to the market in January of 2010, work on such a project would have to begin immediately.

---

4 Relevant portions are discussed in the Affidavit of John M. Cabaniss, Jr.; the entire documents can be found at http://www.arb.ca.gov/regact/grnhsgas/addendum.pdf.

5 These are CARB estimates. The actual requirements of the manufacturers may be different and may in fact require more extensive product redesign in order to comply with these new regulations. *Cabaniss Aff.*, ¶ 16.

6 The model year for a given motor vehicle can begin as early as January of the preceding year. Thus, the 2011 model year can begin in January 2010. *Cabaniss Aff.*, ¶ 14.

The stoichiometric gasoline direct injection is just one example of the type of vehicle design change CARB believes will be necessary in order to meet its new fuel economy regulation. There are a number of others.[7] What all of these technologies have in common is that a substantial amount of lead time – combined with a considerable level of investments of capital and engineering resources – is required to integrate these technologies into a car or truck. *Cabaniss Aff.*, ¶ 19. This lead time is necessary in order to develop the new technologies, manufacture the tooling required to produce and implement the new technology, order component parts from suppliers, test the production processes and vehicle performance, test the vehicle for safety and reliability, and obtain the necessary certifications. *Id.*, ¶ 20. Because of this long lead time, the fundamental design of the body and platform as well as the engine, transmission and other components of the powertrain of a new or redesigned vehicle is completed many years in advance of the time the vehicle enters production. *Id.*

CARB agrees that considerable lead time will be required for an automobile manufacturer to bring its fleet into compliance with the new standards. Based on its most recent analysis, CARB concluded that the minimum lead-time to achieve compliance is four years. Anything shorter than that, CARB has stated, simply would not be feasible. As CARB explained in Section 7.2 of the ISOR concerning regulatory alternatives:

> ***Staff also considered proposing more stringent vehicle standards. This could be accomplished by shortening the phase-in period***, or by building into the standard some degree of early penetration of technologies that the staff technical analysis determined would not be available for widespread application in the near and/or mid term periods. Staff concluded that in either case, ***manufacturers would have a very difficult time incorporating the needed technologies across their fleet as***

---

[7] Another technology is the use of a six-speed automatic transmission. *Cabaniss Aff.*, ¶ 18. These transmissions use a fundamentally different layout of the gear shafts within the transmission which requires very expensive changes in tooling and manufacturing. *Id.*

> ***rapidly as would be necessary.*** Comments received from manufacturers and their consultants on the June 14, 2004 draft staff proposal, which used a three-year phase in schedule rather than the four-year phase in schedule recommended now, served to reinforce this point. Staff therefore rejected this alternative on the grounds that ***more stringent standards would not be technically feasible.***

*ISOR* at 137 (emphasis added). *See also id.* at 2 ("The phase-in period for both the near-term and mid term standards has been extended to four years" in the initial draft of the ISOR).

The purpose of this discussion is not to lend undue credence to CARB's analysis concerning the types of technologies that will be necessary to bring fleets into compliance with these regulations or CARB's conclusions regarding lead-time. In fact, as discussed in the accompanying Cabaniss Affidavit, a four-year lead time is, if anything, on the short side for implementing any *one* of the technologies CARB assumed would be necessary for compliance. *Cabaniss Aff.*, ¶ 19. CARB's analysis assumes that a manufacturer will have to integrate a number of these new technologies in one automobile at the same time, which would compound the engineering challenges and require lead times significantly longer than four years. *Id.* Nevertheless, the point remains that even employing CARB's own unrealistically short lead time, the planning and engineering for the required modifications in the 2010 and 2011 model years would need to begin immediately.[8]

Thus, even CARB's own analyses show that these regulations present automobile manufacturers with a clear and immediate dilemma. The regulations require significant

---

[8] These engineering challenges are compounded by the fact that the typical product cycle for the models of cars and trucks manufactured by AIAM members is five to eight years. *Cabaniss Aff.*, ¶ 22. This product cycle is necessary to recoup the substantial investment made in developing, testing, marketing and machine tooling for a new product. *Id.* If a substantial change is required to the major components of an automobile – such as to the body, engine or transmissions – before the scheduled end of the vehicle's life cycle, then the sunk costs for that vehicle may never be adequately recouped. *Id.*, ¶ 24.

improvement in the fuel economy of new cars and trucks sold in Rhode Island after the 2009 model year. Meeting these new standards would require quick and fundamental design changes in the bodies, engines and powertrains of new motor vehicles. Making these design changes would require an enormous investment by automobile manufacturers and would take years to implement.

## III. ARGUMENT

The "basic rationale" of the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]" *Abbott Lab. v. Gardner,* 387 U.S. 136, 148, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967). As set forth in AIAM's Complaint, there is nothing abstract about the disagreement presented in this action. The DEM has approved regulations that require automobile manufactures to improve the fuel economy of their vehicle fleets in the Rhode Island market, and thereby reduce the emissions of $CO_2$ from those motor vehicles. These regulations are on their face preempted by EPCA and the Clean Air Act. Moreover, these regulations put manufacturers such as AIAM members to a choice between starting now to revamp their automotive fleets in order to meet the new DEM requirements, or risk facing serious sanctions in the future for noncompliance. This is precisely the type of Hobson's choice the ripeness doctrine set forth in *Abbott Labs* was specifically crafted to prevent. Accordingly, AIAM's claims for relief under EPCA and the Clean Air Act are ripe for pre-enforcement review.

### A. Both of AIAM's Claims For Relief Alleging Preemption Under Federal Law Are Ripe For Review Because The DEM Regulations Are Final And Impose An Immediate Hardship On Automobile Manufacturers.

The Defendant's argument that neither the Clean Air Act Count nor the EPCA Count is ripe is based on the notion that although the DEM "has adopted Reg. 37, it cannot enforce its substantive provisions against the Plaintiff unless and until EPA grants a waiver to the State of

California" of EPA preemption. *Defendant's Memorandum* at 3. Thus, the Defendant argues, "[s]ince the greenhouse gas emission standards of Reg. 37 are currently inoperative and will not become operative unless such waiver is granted, the enforceability of the greenhouse gas emissions standards is not an issue for adjudication." *Id.*

The Defendant is apparently arguing that until the DEM Regulations are enforceable by way of the imposition of sanctions for failure to comply, then any challenge to those regulations is not ripe. This argument, of course, ignores the well-settled jurisprudence which specifically allows for pre-enforcement review of regulatory actions. As set forth in *Abbot Labs*, the test for ripeness in the pre-enforcement context depends on "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. In assessing ripeness, the First Circuit has held:

> First, we consider whether an issue is fit for review, e.g., whether a challenged government action is final and whether determination of the merits turns upon facts which may not yet be sufficiently developed. Second, we consider the question of hardship, a question which typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties.

*Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 692 (1st Cir. 1994); *see also Rhode Island Ass'n of Realtors v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999) ("To determine whether a case is ripe for review, a federal court must evaluate the fitness of the issue presented and the hardship that withholding immediate judicial consideration will work.") As one court describes the test:

> Fitness and hardship function as independent but related variables, the former as a measure of the interests of the court and agency in postponing review and the latter as a measure of the challenging party's countervailing interest in securing immediate judicial review. ***The judiciary's ultimate determination of ripeness in a specific setting depends on a pragmatic balancing of those two variables and the underlying interests which they represent.***
>
> Under this 'practical common sense' approach, the ripeness inquiry does not turn on nice legal distinctions. [Citation] ***Courts confronted with close questions of***

> ***ripeness are appropriately guided by the presumption of reviewability, especially when the affected person is confronted with the dilemma of choosing between disadvantageous compliance or risking imposition of serious penalties.***

*Ciba-Geigy Corp. v. United States EPA*, 801 F.2d 430, 434 (D.C. Cir. 1986) (emphasis added). Here, AIAM easily satisfies both prongs of ripeness.

### 1. AIAM's Claims Are Fit For Review Despite The Pendency of California's Waiver Application.

The Defendant's argument that this action is not ripe because of the contingency surrounding EPA's consideration of California's waiver request pertains to the "fitness" prong of the ripeness inquiry. *Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530, 356 (1st Cir. 1995) (cited in *Defendant's Memorandum* at 5-6). An analysis of the rule cited by the Defendant shows that the existence of contingent events will ordinarily only bear on the ripeness inquiry if those events will impact the fitness of the record on which the court is to decide the action. As the *Ernst & Young* court stated, the rule that an action may not be ripe if it is dependent on contingent events "reflects an institutional awareness that the fitness requirement has a pragmatic aspect: issuing opinions based on speculative facts or a hypothetical record is an aleatory business, at best difficult and often impossible." *Id.* In conceding the limits of this doctrine, the *Ernst & Young* court specifically noted that "the raw fact that events have not yet fully unfolded is not always fatal to justiciability. In such straitened circumstances, courts sometimes exhibit a greater willingness to decide cases that turn on legal issues ***not likely to be significantly affected by further factual development.***" *Id.* at 536 (emphasis added).

In *Ernst & Young*, the court found that the matter was not ripe because the existence of a justiciable dispute depended on "a lengthy chain of speculation as to what the future has in store" -- specifically, the harmonic convergence of eight future contingent events without which there

would be no dispute. The court thus found that "[t]his is a long string of contingencies -- so long that E&Y's assertion of fitness for judicial review trips over it and falls." *Id.* at 538.

Here, the decision on the EPA waiver request does not present a "long string of contingencies," nor does it have any impact on the factual development of the case. The DEM Regulations are already on the books and there is a full and complete record concerning their enactment, both in Rhode Island and California. Furthermore, the issue presented in this action is predominantly legal, and the ability of this Court to address those issues will be unaffected by EPA's waiver decision. *See Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33-34 (1st Cir. 1996) (action ripe where it "presents a single, purely legal question."); *Riva v. Comm. of Mass.*, 61 F.3d 1003, 1009-10 (1st Cir. 1995) ("Courts are more likely to find a claim ripe if it is of an intrinsically legal nature"); *Pustell v. Lynn Public Schools*, 18 F.3d 50, 52 n.3 (1st Cir. 1994) ("The 'fitness' inquiry asks whether the challenged action is final, and whether the issue presented is purely legal, rather than in need of more concrete factual development."); *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 692 (1st Cir. 1994); ("[b]ecause the required interpretation of the Settlement Act projects a 'purely legal' issue [citation] the resolution of which will not be changed by further factual development" the action is ripe.)

It is well settled that actions challenging state or local regulations on preemption grounds raise predominantly legal questions and are therefore fit for review. *See, e.g., Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201, 103 S. Ct. 1713, 1720-21, 75 L. Ed. 2d 752 (1983) ("The question of pre-emption is predominantly legal, and although it would be useful to have the benefit of [the state's interpretation and application of its regulations], resolution of the pre-emption issue need not await that development."); *Hotel Employees. & Restaurant Employees. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 153

(9th Cir. 1992) ("Preemption is predominantly a legal question, resolution of which would not be aided greatly by development of a more complete factual record."). Whether or not EPA grants California a Clean Air Act preemption waiver will have no impact on whether the DEM Regulations are "related to fuel economy standards or average fuel economy standards," and are therefore preempted under EPCA, 49 U.S.C. § 32919, or whether they are currently preempted under the Clean Air Act as alleged in the Complaint.

**2. AIAM Has Alleged Sufficient Facts To Satisfy The Hardship Prong.**

Another dispositive distinction between this case and *Ernst & Young* and the other cases cited by the Defendant concerns the "hardship" prong of the ripeness inquiry. As *Ernst & Young* makes clear, the existence of contingent events will be overcome where the mere enactment of a statute or regulation causes immediate harm to the plaintiff, even though it is not yet being enforced: "even when the direct application of a statute is to some degree remote or contingent, its collateral effects may inflict present injuries that, though indirect, are adequate to support a finding of ripeness." *Ernst & Young*, 45 F.3d at 536. For example, relying on the Supreme Court case of *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201, 103 S. Ct. 1713, 1720-21, 75 L. Ed. 2d 752 (1983), the court noted that "an injury sufficient to impute ripeness may also be found when a plaintiff must presently decide to expend substantial resources which may turn out to be wasted, depending on later clarification of the law." *Ernst & Young*, 45 F.3d at 536-37; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (although pre-enforcement review is normally precluded, "the major exception . . . is a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately"); *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 417-419, 86 L. Ed. 1563, 62 S. Ct. 1194 (1942) (finding challenge ripe where plaintiffs must comply with

burdensome Federal Communications Commission rule at once or risk later loss of license and consequent serious harm).

In contrast to the plaintiff in *Ernst & Young* – whose only hardship was increased pressure to settle a pending case and the inability to evaluate its exposure therein (*Ernst & Young*, 45, F.3d at 539) – AIAM's members "must presently decide to expend substantial resources [to comply with the DEM Regulations] which may turn out to be wasted, depending on later clarification of the law." *Ernst & Young*, 45 F.3d at 536-37. As discussed above, CARB determined that starting with the 2009 model year and thereafter, automobile manufacturers will be required to offer completely redesigned automobiles in order to meet CARB's aggressive new $CO_2$ emission standards. The changes CARB envisions – such as turbocharging the engine, installing a six-speed transmission, or providing for stoichiometric gasoline direct injection – go to the very foundation of automotive design. Designing new cars with these types of advanced technologies requires substantial lead time. CARB itself determined that a manufacturer will be required to integrate these technologies in order to bring its fleet into compliance with these regulations, and conceded that it would take a minimum of four years to do so.[9] In fact, CARB concluded that it would not have been possible to shorten the phase-in period because "more stringent standards would not be technically feasible" since "manufacturers would have a very

---

9 As the Cabaniss Affidavit points out, a four-year lead time is likely to be an underestimate even for a single technology. For the simultaneous implementation of multiple brand new technologies, such as CARB has concluded will be required, the lead time would be significantly longer. *Cabaniss Aff.*, ¶ 19.

difficult time incorporating the needed technologies across their fleet as rapidly as would be necessary." *ISOR* at 137.[10]

Accordingly, the rule set forth in *Abbott Labs* and its progeny is directly applicable here. If "promulgation of the challenged regulations presents plaintiffs with the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation," the controversy is ripe. *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57, 125 L. Ed. 2d 38, 113 S. Ct. 2485 (1993) (construing *Abbott Labs.*); *see also Pacific Gas & Elec. Co.*, 461 U.S. at 201-02, 103 S. Ct. at 1721 (preemption claim against moratorium on new nuclear power plants ripe because "to require the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable hardship on the utilities, and may ultimately work harm on the citizens of California").[11] This action is therefore ripe for review.

---

[10] Therefore, the Defendant's argument that "[a]t present, Plaintiff has no legal obligation to comply with Reg. 37" and that "Plaintiff can make a business decision to comply with the greenhouse gas emissions standards in Reg. 37, but that would be a voluntary choice, not a legal obligation," *see Defendant's Memorandum* at 6, is absurd both as a factual and legal matter.

[11] In this way, this action is distinguishable from the Clean Air Act actions cited by the Defendant. In *International Truck and Engine Corp. v. Lloyd*, CIV S-01-1245 (E.D. Cal. Oct. 24, 2001) (cited in *Defendant's Memorandum* at 6), for example, the court specifically recognized that in some cases "the very promulgation of a law may itself affect a party enough to satisfy the constitutional requirement," but held that the case before it was not such a case because the plaintiff had not shown that it the regulation "require[d] immediate changes in its present conduct so it could avoid future sanctions." Similarly, there was no finding in *Motor Vehicle Mfrs. Ass'n of the United States v. New York State Dept. of Envtl. Conservation*, 17 F.3d 521 (2d. Cir. 1994) (cited in *Defendant's Memorandum* at 8) that the plaintiffs were having to alter their conduct in order avoid future sanctions.

Moreover, although those cases did hold that a granting of a waiver to California was not a precondition to other states adopting the California standards, those statements run counter to

[Footnote continued on next page]

**B. AIAM'S First Claim For Relief Alleging Preemption Under EPCA Is Ripe For Review Irrespective Of The Pending Clean Air Act Waiver Request.**

As discussed above, AIAM's claim for relief under EPCA is ripe because (1) The DEM Regulations are final, (2) there is no further or contingent factual development that would assist this court in deciding the legal preemption issue, and (3) the undisputed evidence shows that the regulations present AIAM members with an immediate dilemma between taking steps now to comply with the regulations or risk sanctions for being out of compliance in the future.

Nevertheless, the Defendant attempts to shoehorn his Clean Air Act waiver argument into AIAM's EPCA count by arguing that the EPCA count "turns on the question of whether the California standards are a legitimate exercise of California's authority under Section 209(b) of the Clean Air Act," and that if EPA grants the waiver, then "NHTSA is required to consider the effect of those standards on fuel economy." *Defendant's Memorandum* at 11-12.

The Defendant is clearly overreaching here as this is simply not an accurate statement of the law. The issue of preemption under EPCA and the question of whether California is entitled to a waiver of Clean Air Act preemption under Section 209 of the Clean Air Act are two separate inquiries, and one is not necessarily dispositive of the other. In fact, the D.C. Circuit has

---

[Footnote continued from previous page]

the express language and clear intent of the Clean Air Act. For that reason, AIAM believes that those elements of the cited cases should not be followed. *See* 42 U.S.C. § 7507 (providing that a state "may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 209(a) [42 USCS § 7543(a)] respecting such vehicles if--(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and (2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator)"). Allowing a state to adopt a California standard prior to the granting of a waiver and then to enforce the standard instantaneously upon the granting of the waiver would deprive manufacturers of the two-year lead time required by the statute. To hold otherwise would unjustly require manufacturers to act to bring their fleets into compliance with regulations that are ultimately held not to be a valid exercise of State authority.

specifically held that the Administrator of EPA may confine his inquiry on the waiver request to those factors specifically enumerated in Section 209 of the Act, and refuse to address extraneous constitutional issues. *Motor and Equipment Manufacturers Ass'n v. EPA*, 627 F.2d 1095, 1114-15 (D.C.Cir. 1979). Rather, the D.C. Circuit found that courts provide an adequate forum for parties to raise constitutional challenges to a California regulation. *Id.*

Although the D.C. Circuit did not hold that the Administrator of EPA is forbidden from addressing constitutional issues in deciding a waiver request, reserving that question for another day, *id.* at 1114 n. 41, California has taken the argument one step further and advocated the position that "U.S. EPA cannot apply any additional criteria [in addition to those set forth in Section 209] – such as potential conflicts with other law– in evaluating California's waiver requests." *See Request for a Clean Air Act Section 209(b) Waiver of Preemption for California's Adopted and Amended New Motor Vehicle Regulations and Incorporated Test Procedures to Control Greenhouse Gas Emissions: Support Document* at 10 (available at http://www.arb.ca.gov/cc/docs/att2_support.pdf). If EPA were to agree with California's position, then EPA's waiver determination would explicitly exclude a determination of whether the DEM Regulations are preempted by EPCA. Accordingly, a grant by EPA of California's waiver request would not constitute a definitive statement by the federal government that the DEM regulations are not preempted by EPCA, as the Defendant contends. *See Defendant's Memorandum* at 12 ("It is difficult to hypothesize . . . how RIDEM could violate EPCA if the federal government itself grants California's waiver request.")

As a matter of fact, the federal government has already spoken to the issue of EPCA preemption and determined that state regulation of vehicular $CO_2$ emissions are not permissible under that statute. The National Highway Traffic Safety Administration, the federal agency

tasked with enforcing the fuel economy program under EPCA,[12] has thoroughly examined the issue and concluded as follows:

> In mandating federal fuel economy standards under EPCA, Congress has expressly preempted any state laws or regulations relating to fuel economy standards. A State requirement limiting $CO_2$ emissions is such a law or regulation because it has the direct effect of regulating fuel consumption. $CO_2$ emissions are directly linked to fuel consumption because $CO_2$ is the ultimate end product of burning gasoline. Moreover, because there is but one pool of technologies for reducing tailpipe $CO_2$ emissions and increasing fuel economy available now and for the foreseeable future, regulation of $CO_2$ emissions and fuel consumption are inextricably linked. It is therefore NHTSA's conclusion that such regulation is expressly preempted.
>
> A State requirement limiting $CO_2$ emissions is also impliedly preempted under EPCA. It would be inconsistent with the statutory scheme, as implemented by NHTSA, to allow another governmental entity to make inconsistent judgments made about how quickly and how much of that single pool of technology can and should be required to be installed, consistent with the need to conserve energy, technological feasibility, economic practicability, employment, vehicle safety and other relevant concerns.

*Average Fuel Economy Standards for Light Trucks: Model Years 2008-2011*, 71 Fed. Reg. 17,566, 17,654 (April 6, 2006). EPA is on record as agreeing, concluding that "Congress has not authorized the Agency to regulate $CO_2$ emissions from motor vehicles to the extent such standards would effectively regulate car and light truck fuel economy, which is governed by a comprehensive statute administered by DOT." *Notice of Denial of Petition For Rulemaking*, 68 Fed. Reg. 52922, 52929 (Sept. 8, 2003).

The Defendant's entire argument why AIAM's EPCA count is not ripe for review is therefore built on a single pillar that cannot stand. Whether or not EPA grants California's waiver request, the DEM Regulations are preempted because they are "related to fuel economy

---

[12] *See* 41 Fed. Reg. 25015 (1976).

standards or average fuel economy standards." 49 U.S.C. § 32919. This dispute is ripe for review and there is no reason for delay.

## IV. CONCLUSION

For the reasons set forth above, AIAM's action is ripe for review because the challenged state action is final and fit for review, and because the DEM Regulations work an immediate hardship on AIAM members. Therefore, the Defendant's Motion to Dismiss should be denied.

Dated: April 25, 2006

Respectfully Submitted,

Plaintiff Association of
International Automobile
Manufacturers,

By its Attorneys,

Joseph V. Cavanagh, Jr. (#1139)
Kristin E. Rodgers (#4842)
Mary C. Dunn (#6712)
BLISH & CAVANAGH, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903
Tel: (401) 831-8900
Fax: (401) 751-7542
Emails: jvc@blishcavlaw.com
ker@blishcavlaw.com
mcd@blishcavlaw.com

Raymond B. Ludwiszewski
Charles H. Haake
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
Emails:
rludwiszewski@gibsondunn.com
chaake@gibsondunn.com

Of Counsel

**CERTIFICATION**

I hereby certify that on the 25th day of April, 2006, a copy of the within Motion was hand delivered to the following counsel of record:

Michael Rubin, Esq.
Trish K. Jedele, Esq.
Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903

[signature]